Argued and submitted September 17, 2008, affirmed May 27, 2009

Erik ROSEKRANS
and Marina Counter,
*Plaintiffs-Respondents,*

*and*

Renee BERGMAN
and Janis Tietjen,
*Plaintiffs,*

*v.*

CLASS HARBOR ASSOCIATION, INC.,
an Oregon nonprofit corporation,
*Defendant-Appellant.*

Multnomah County Circuit Court
050505342; A134458

209 P3d 411

Richard R. Spirra, California, argued the cause for appellant. On the opening brief were Christopher E. Hawk and Gordon & Rees LLP. With him on the reply brief were Christopher E. Hawk and Gordon & Rees LLP.

Kim T. Buckley argued the cause for respondents. With him on the brief was Esler, Stephens & Buckley.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

This dispute arises from the attempted compelled relocation of a floating home to another slip within the same moorage. Plaintiffs, Erik Rosekrans and Marina Counter, are "licensees" of a floating home slip in a moorage owned and operated by defendant Class Harbor Association, Inc. (the "association"). Plaintiffs brought this action against the association after it amended its bylaws to change the location of plaintiffs' floating home slip and attempted to force plaintiffs to move their floating home into its new slip location. The trial court granted plaintiffs relief on their quiet title and declaratory judgment claims and dismissed the association's counterclaim seeking declaratory and injunctive relief. The association makes multiple assignments of error on appeal, and we affirm.

As explained below, the association's only preserved assignment of error pertaining to the merits involves a declaratory ruling construing a contract. Given that posture, we are bound by the trial court's predicate factual determinations if there is any evidence to support them. *Wadsworth v. WWDM, Ltd.*, 162 Or App 622, 628 n 1, 986 P2d 1197 (1999), *rev den*, 330 Or 71 (2000) ("Declaratory judgment proceedings seeking the construction of a contract are legal in nature, and the factual determinations of the trier of fact are binding on appeal if there is evidence to support them."). Where findings are not made on disputed issues of fact and there is evidence from which those facts could be decided more than one way, we will presume that they were decided in a manner consistent with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We proceed to describe the material facts consistently with that standard of review.

## I. MATERIAL FACTS AND PROCEDURAL BACKGROUND

### A. *Factual Background and History of the Dispute*

The association is a nonprofit corporation that owns, operates, and maintains "Class Harbor," a floating home moorage located on the submerged and submersible lands in the bed of North Portland Harbor (Oregon Slough). The association was first incorporated in the early 1980s by Class, the

original purchaser of the upland property abutting the floating home moorage. Class sold that property to one of the floating home members, who, in turn, sold the property to the association.

The State of Oregon owns the submerged and submersible land under the Oregon side of the Columbia River where the association's moorage is located. *See* ORS 274.025. The Division of State Lands (DSL) has the authority to lease state-owned submersible or submerged lands. *See* ORS 274.915. A lease is required from DSL for the use of state-owned submerged and submersible lands to moor floating homes. *See* OAR 141-082-0030(1)(c). In 1990, DSL leased to the association the submerged and submersible lands adjacent to the upland property that the association had purchased.

The association is composed of a board of directors and "members." A person automatically becomes a "member" of the association upon becoming the legal "owner" or contract purchaser of a "membership certificate." Although the original members purchased their certificates from the association, subsequent members purchase them directly from the current certificate owner. The association's president and secretary sign each membership certificate. The membership certificates are numbered 1 through 24, corresponding to the floating home slip numbers in the moorage. The membership certificate provides, in part:

> "The rights of any owner of this Certificate are subject to the Articles of Incorporation and Bylaws of Class Harbor Association, Inc., and to all of the terms, covenants, conditions, and provisions, including rules and regulations adopted thereunder, contained in the Articles and the Bylaws. This limits and restricts the title and rights of any transferee of this Certificate. Copies of the Articles of Incorporation, Bylaws, and rules and regulations are on file and are available for inspection at the office of the Association."

Under its bylaws, the association shall enter into a license agreement with each of its members for the "use and occupancy of the slip whose number corresponds to the member[']s membership certificate." That license agreement provides, in part:

"A.   WHEREAS, Association is the owner of a residential moorage consisting of floating ramps, walkways, and 24 slips suitable for mooring floating homes ('Moorage'); and

"B.   WHEREAS, Member is the owner of membership Certificate No. _____ in the Association; and

"C.   WHEREAS, the Association is authorized pursuant to * * * its Bylaws to enter into a license agreement with each of its members for the use and occupancy of the slip whose number corresponds to the member's membership certificate.

"NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, the parties agree as follows:

"1.   Association hereby grants to Member a license to exclusively occupy slip number in accordance with the terms and conditions of the Articles of Incorporation, the Bylaws, and such other rules and regulations as the Association through its Board of Directors, may from time to time adopt.

"2.   Member covenants and agrees to promptly and faithfully comply with all such terms and conditions and hereby acknowledges that such prompt and faithful compliance is a condition precedent to the continuation of this License Agreement.

"3.   The license granted herein may be revoked by the Association in accordance with the provisions set forth in its Bylaws and in any event the license shall be revoked upon the earliest of the following events: a. Sale or transfer of Member's membership certificate; b. Termination, for any reason, of the Submerged Lands Sublease; or [c]. Dissolution of the Association."

On July 31, 2000, plaintiffs purchased membership certificate number 14 from its previous owners for $53,000. On the same day, they entered into the above license agreement with the association to "exclusively occupy" slip number 14 ("slip 14").[1]

---

[1] In July 2000, plaintiff Rosekrans was the sole purchaser of the membership certificate and the sole member to enter into the license agreement with the association. Plaintiffs' understanding was that, as a domestic partner to Rosekrans, plaintiff Counter had the same rights as Rosekrans under the membership certificate and license agreement. Counter attended membership meetings and fully participated in membership events until May 2003, when Counter heard a rumor that

Before purchasing the membership certificate, plaintiffs reviewed the association's bylaws and license agreement. Pertinent to this appeal, at the time plaintiffs purchased their membership certificate, Article I, section 5, of the bylaws stated that "Class Harbor is a residential moorage. The moorage consists of floating ramps, walkways and 24 slips *in general conformity with the layout attached hereto as Exhibit 'A.'* " (Emphasis added.) Article VI, section 1, of the bylaws stated that the "moorage contains 24 slips, designated 1 through 24, *as shown on Exhibit 'A.'* * * * Slips numbered 13 through 24 are 28 feet wide and 40 feet long." (Emphasis added.) Exhibit "A" to the bylaws was a drawing of the moorage, which depicted the respective "location" of the slips.[2] That exhibit revealed that slip 14 was an inside (*i.e.*, landward) slip, located one slip west of the east-end slip, slip number 13 ("slip 13"), and three slips east of the ramp. That is, slip 14 was the next-to-last slip on the inside east end of the dock, which contained four slips. The configuration of the inside slips east of the ramp is generally illustrated by the following diagram:

---

the association would not continue to allow her to attend association meetings because she was not technically a member. Accordingly, in May 2003, Counter became a 50 percent owner of the original membership certificate. At that time, the association issued a new membership certificate and a new license agreement— identical to the original ones Rosekrans entered in July 2000—with both plaintiffs' names on them. The association did not contend before the trial court, or on appeal, that there is any differentiation in contractual obligations between the association and Rosekrans and the association and Counter. Thus, for purposes of this appeal, we shall consider the original membership certificate and license agreement to apply to both plaintiffs.

[2] It was disputed throughout trial whether Exhibit "A" was a scale drawing, and, thus, whether it depicted the *particular* location of the slips or their *relative* location.

Plaintiffs also visited the moorage site to personally view then-vacant slip 14. Plaintiffs measured the slip and personally observed its "location" on the moorage, including the particular views the slip afforded. Plaintiffs decided to purchase the membership certificate for slip 14 based on its privacy, views, and distance from the ramp, which allowed for easy boating access as well as additional privacy. An attractive feature of slip 14 to plaintiffs was its location on a part of the dock that had a notch that extended six feet towards the land, so that their floating home would extend past the floating home to the west of it, allowing for greater views both downriver and upriver.

After purchasing the membership certificate and entering into the license agreement with the association, plaintiffs designed (and ultimately built) a floating home that specifically conformed to, and enhanced, the distinctive features of slip 14, including capturing the ventilation between the neighboring floating homes, blocking the sun by building screens and overhangs in particular locations, maximizing the open water views, and maximizing privacy by minimizing the view of the ramp, the mail area, and surrounding neighbors. Plaintiffs also built a large electrical box on the dock behind their home with the assistance of a contractor and painted it to match their floating home. In designing their floating home, plaintiffs relied on Exhibit "A" of the bylaws, as well as their personal observations of the slip location and the measurements they took of slip 14.

On March 4, 2004, DSL notified the association by letter that it was in violation of its lease with DSL because its floating home moorage was trespassing over both the east- and west-end boundaries of its submerged land lease.[3] In particular, and as relevant to this dispute, the floating home moorage was trespassing beyond the east-end boundary of the submerged land lease by about 30 feet.

---

[3] Whether the association had knowledge of the trespass before the notification from DSL in March 2004 and, in particular, before plaintiffs purchased their membership certificate and entered into the license agreement with the association was disputed. The record, however, discloses that the association had knowledge that slip 13 was trespassing beyond the east-end boundary of the submerged land lease as early as 1990.

The association's board of directors created a "brainstorming committee" to develop possible solutions to fix the boundary issues. The boundaries of the submerged land lease, as correctly identified, contained space adequate for only 23 slips suitable for mooring floating homes, and not the 24 slips that currently existed. The brainstorming committee considered several options for fixing the east-end boundary trespass but eventually settled on the plan that plaintiffs challenge in this action. That plan preserved the relative position of plaintiffs' slip, slip 14, and the east-end slip, slip 13, but "bumped" them the necessary distance west to remove the trespass—about 29 feet. That is, the plan, in "semi-domino" fashion, (1) eliminated as a slip the location originally designated as "slip 13"; (2) redesignated plaintiffs' location as "slip 13"; and (3) redesignated the location originally designated as "slip 15" as "slip 14."[4] That reconfiguration is generally illustrated by the following diagram:

Plaintiffs objected to that plan.

## B. *Preliminary Injunction Proceedings*

In order to carry out the above plan, on May 12, 2005, the association's members, by a 83.3 percent vote, authorized the board to spend $50,000 to purchase vacant slip number 19 ("slip 19").[5] That purchase would allow the association to move the floating home located in slip 15 into slip 19. Slip 19 was another inside (*i.e.*, landward) slip, three slips west of the ramp.

---

[4] The licensees who had been in the location originally designated as "slip 15" moved their floating home into another unoccupied slip at the moorage.

[5] The association's bylaws provide that expenditures of funds by the board exceeding $2,500 require a resolution.

Plaintiffs sought a temporary restraining order (TRO) eight days after that authorization. Plaintiffs were granted a TRO preventing the association from purchasing slip 19, but their ultimate request for a preliminary injunction prohibiting the association from completing that transaction was denied.

The association was thus allowed to commence its plan; therefore, it purchased membership certificate number 19 from its owner and moved the floating home located in slip 15 into slip 19. The affected member, the owner of membership certificate 15, acquiesced in that move. The members then voted to approve three additional amendments to the bylaws: (1) to reduce the number of slips in the moorage from 24 to 23; (2) to amend Exhibit "A" to the bylaws to reflect the elimination of slip 15 and the changed locations of slips 13 and 14; and (3) to restrict the association's ability to move floating homes except as required by DSL, applicable law, or court or administrative orders. Each amendment passed by more than an 80 percent vote.[6] The members also approved the expenditure of funds to move the floating homes into their new "locations." The new locations of the slips were reflected on an amended drawing of the moorage, Exhibit "A-1" to the amended bylaws.

## C.  *This Action Against the Association*

On May 19, 2005, plaintiffs commenced this action against the association, bringing claims for, as pertinent to this appeal, quiet title and declaratory judgment. Plaintiffs also brought claims for breach of fiduciary duty, reformation of the license agreement, oppression, and relief under the residential landlord and tenant act (RLTA), ORS chapter 90.[7]

On their quiet title claim, plaintiffs alleged that the association had an interest adverse to plaintiffs in "the exclusive occupancy and quiet enjoyment" of slip 14. Plaintiffs

---

[6] The association's bylaws provide that amendments to the bylaws may be enacted by a two-thirds vote of the members.

[7] Other members, affected by the west-end boundary dispute, also joined as plaintiffs in the action. All other plaintiffs settled with the association before the end of trial.

alleged that (1) slip 14 was unique; (2) plaintiffs had detrimentally relied on representations made by the association that they had a right to "exclusively occupy" slip 14 as designated in Exhibit "A" to the bylaws; and (3) the location of the slip was material to the license agreement. Plaintiffs also alleged that any amendments to the bylaws purporting to change the location of the boundaries of slip 14 had no effect on the rights and obligations of the parties under the license agreement. Finally, plaintiffs asserted that they had no adequate remedy at law.

On their claim for declaratory judgment relief, plaintiffs asked the court to declare the rights and legal relations of the parties to the license agreement. Plaintiffs alleged that the association had attempted to breach, interfere with, rewrite, or repudiate the license agreement by interfering with plaintiffs' right to exclusively occupy slip 14. Furthermore, plaintiffs alleged that the association had the right to revoke plaintiffs' license only upon the occurrence of certain events, none of which had occurred.

In their prayer for relief, plaintiffs sought the following: (1) a judgment describing the boundaries of slip 14; (2) a judgment determining all adverse claims and rights of the association to slip 14; (3) a judgment declaring that (a) plaintiffs have the right to exclusive occupancy and quiet enjoyment of slip 14 "so long as they adhere to the terms of the exclusive license agreement," and (b) the association "has no right to breach, rewrite, repudiate, or interfere with the exclusive license agreement so long as [plaintiffs] adhere to the terms of the exclusive license agreement"; (4) a judgment prohibiting the association from moving or attempting to move, directly or indirectly, plaintiffs' floating home, or the location of the boundaries of their slip; and (5) such other relief as may be equitable.

The association brought a counterclaim against plaintiffs for declaratory and injunctive relief. The association sought a declaration that the amendments to the bylaws were valid and that plaintiffs were required to comply with the terms of those amendments—particularly, the amended Exhibit "A-1" and the reconfigured slip locations that it

depicted. The association also sought an injunction prohibiting plaintiffs from interfering with the association's "plan to cure the trespass onto state lands."

Although the parties vehemently disputed a variety of matters, their core dispute pertained to the effect of the amendments to the bylaws, specifically invoking the amended Exhibit "A-1." The association's position was principally predicated on the following language of the license agreement:

> "Association hereby grants to Member a license to exclusively occupy slip number *in accordance with the terms and conditions of * * * the Bylaws * * *.*"

(Emphasis added.) The association asserted that, pursuant to that language, plaintiffs' entitlement under the license agreement to exclusive occupancy of slip 14 was necessarily subject to properly adopted amendments to the bylaws, including amendments reconfiguring or renumbering slips.

Plaintiffs remonstrated that the association could not unilaterally alter the parties' contractual duties under the license agreement by amending the bylaws. That is, although the association could amend the bylaws so as to reasonably modify the terms on which plaintiffs could occupy the slip location designated as "slip 14" at the time that the license agreement was executed, plaintiffs' exclusive entitlement to occupy that location, as opposed to any other, could not be abrogated by way of an amendment to the bylaws.

Plaintiffs alternatively contended that the license had become irrevocable because plaintiffs had relied on the license and contributed to the value of the property. Plaintiffs emphasized that they paid $53,000 for the membership certificate and specifically designed and built their floating home in reliance on the license agreement. Thus, according to plaintiffs, their license became irrevocable when they paid the $53,000 and designed and built their floating home in reliance on the license agreement.

The association responded that plaintiff did not buy a *specific location* in the moorage, but, rather, a *relative position*. Finally, the association asserted that plaintiffs' license had not been revoked; rather, the association had only

amended a term of the license agreement—the location of plaintiffs' slip.[8]

## D. *The Trial Court's Ruling*

The trial court granted plaintiffs declaratory and injunctive relief, "agreeing with the plaintiffs' primary argument under their quiet title and declaratory judgment claims for relief, so that the plaintiffs have the exclusive occupancy rights they seek and that [the association] cannot force the plaintiffs to move under the current plan." The trial court reasoned that

> "plaintiffs justifiably believed that they were purchasing a relatively specific set of property rights when they purchased their slips and membership certificates. While property situated on a river is not the same as that on land, it is more like that on land than a movable rental unit. Here, the property is more like a condominium than an apartment, more like a house than a boat."

The court concluded:

> "Under their License Agreements, plaintiffs * * * are entitled to exclusively use and occupy Slip No. 14, the location of which is identified and described on Exhibit A * * *. The location of Slip No. 14 is more than its mere relative order vis-à-vis the other slips. [Plaintiffs] are entitled to have Slip No. 14 located as close to the exact location of Slip No. 14 that [the association] licensed to [plaintiffs] as is reasonably possible under maritime conditions * * *."

The trial court permanently enjoined the association from changing or attempting to change the location of slip 14 or forcing or requiring plaintiffs to move their floating home from slip 14 under the circumstances of this case (*i.e.*, "there

---

[8] On February 9, 2006, sometime during the course of this litigation, counsel for the association sent a letter to plaintiffs' counsel warning plaintiffs that the association would revoke their license on the ground that plaintiffs were allegedly in violation of the amended bylaws. That letter stated, in part:

> "As you are aware, the Bylaws for Class Harbor have been amended. Your home is in violation of your license agreement in that it is located in slip 13. Your license is for slip 14. Your failure to rectify this breach prior to March 1, or such date otherwise negotiated with [the association], will result in the termination of your license."

The record does not disclose that the association actually revoked plaintiffs' license.

being no necessity to require plaintiffs * * * to move their floating home from the floating home space location that [the association] licensed to them ([Slip No. 14]) to comply with safety issues, the Submerged Land Lease, or the law").[9]

The trial court dismissed the association's counterclaim. The court determined that plaintiffs were the prevailing party on their quiet title and declaratory judgment claim, as well as on the counterclaim, and awarded plaintiffs attorney fees on those claims.

Finally, the trial court also dismissed, on the merits, plaintiffs' claims for breach of fiduciary duty, oppression, and relief under the RLTA. The trial court determined that the association was the prevailing party on those claims but concluded that it was not entitled to recover attorney fees on any of those claims. Specifically, the court reasoned that there were no contractual or statutory bases for fee entitlement on the breach of fiduciary duty and oppression claims and that ORS 90.255 did not authorize attorney fees for the RLTA claim.

## II.  ANALYSIS

On appeal, the association advances six assignments of error. The first three assignments of error pertain to the trial court's grant of declaratory and injunctive relief to plaintiffs under their quiet title and declaratory judgment claims and to its dismissal of the association's counterclaim. The final three pertain to the trial court's award of attorney fees to plaintiffs and to its denial of attorney fees to the association on the claims on which it prevailed. For the reasons that follow, we reject each of the association's assignments of error.

### A.  *Preservation*

As explained below, we determine that the association failed to preserve its first and third assignments of error for our review. For analytic coherence, we begin with the third assignment. In its third assignment of error, the association contends that the trial court erred when it granted

---

[9] The court dismissed plaintiffs' reformation claim as moot because the association admitted that the numeral "14" had been mistakenly omitted from the license agreement following the words "slip number" in paragraph 1.

plaintiffs injunctive relief for the association's alleged breach or wrongful revocation of the license agreement. Specifically, the association asserts that, even if plaintiffs established the requisite breach or revocation, injunctive relief was inapposite because the proper remedy for a breach of a license agreement—*viz.*, a contract—is compensatory damages. According to the association, an injunction was not appropriate here because damages would be adequate to compensate plaintiffs for any loss they sustained as a result of not receiving what they expected under the license agreement.

Plaintiffs assert that the association did not raise that contention before the trial court and, accordingly, the association's present contention on appeal is not preserved for our review. The association responds that the matter is preserved because the association contended both in its answer, and in opposing plaintiffs' motion for preliminary injunction, that plaintiffs were not entitled to injunctive relief for what plaintiffs alleged was the breach or wrongful revocation of the license agreement. As we have consistently reiterated, our determination of whether a contention has been preserved for our review is guided by the principles prescribed in *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). That is, was the trial court sufficiently, specifically alerted to the pertinent error so as to permit the court to "consider and correct the error immediately, if correction is warranted"? *Id.*

Here, the answer to that question is clearly "no." The association may have contended to the trial court that plaintiffs were not entitled to injunctive relief—but not for the reasons it now offers on appeal. The record discloses that the association did *not* argue to the trial court, in opposing plaintiffs' motion for preliminary injunction or at any other time during the litigation, that injunctive relief was inapposite because compensatory damages would be adequate to compensate plaintiffs for any loss they sustained as a result of not receiving what they expected under the license agreement.[10] Furthermore, the association did not dispute plaintiffs' counsel's contention during closing arguments that

---

[10] In its answer, defendant, without amplification, denied plaintiffs' assertion that they had no adequate remedy at law, but never subsequently developed that generic denial.

"a contract purporting to convey real property that's to be used as a residence is subject to specific performance. It's not something that damages would be an adequate remedy."

Given those circumstances, the association's present claim of error was unpreserved for our review. *Wyatt*, 331 Or at 343.

■     We turn to the association's first assignment of error. The association contends that the trial court erred in concluding "that Plaintiffs had acquired *property rights* in the boat slip they were granted a license to use." (Emphasis added.) As we understand it, the association contends that the trial court erroneously granted declaratory and injunctive relief under both plaintiffs' quiet title and declaratory judgment claims, and erroneously denied the association's counterclaim, based on the "false premise" that plaintiffs had "property rights" in slip 14. *See, e.g.*, ORS 105.605 (quiet title claims may be brought by "[a]ny person claiming an *interest* or estate in real property" (emphasis added)). According to the association, the trial court erred because a license does not convey to a licensee any interest in real property.

Plaintiffs do not assert that the association's first assignment of error was not preserved for our review. Nonetheless, we are enjoined, as a prudential matter, to determine independently whether the association adequately raised and preserved its present contention before the trial court. *Wyatt*, 331 Or at 344-46; *see also State v. Rumler*, 199 Or App 32, 39, 110 P3d 115 (2005) (appellate court "must determine *sua sponte* whether error was preserved").

The association contends that it preserved its contention on appeal because it asserted throughout the litigation that plaintiffs had merely acquired a "license" to use slip 14 and that plaintiffs were "licensees." The association is correct that it employed the terms "license" and "licensee" throughout the litigation. However, the association never contended that plaintiffs, as licensees, did not have "property rights" in slip 14. Even if the use of such terms could, *arguendo*, sufficiently and specifically alert the trial court of the association's view that plaintiffs had no "property interests" in slip 14, the association never took the extra—indeed, imperative—step required to fairly alert the trial court that a

lack of property rights in slip 14 was fatal to plaintiffs' claims: The association never told the trial court that (1) plaintiffs' quiet title allegations fail to state a claim because plaintiffs have no interest in real property; and (2) plaintiffs' declaratory judgment claim could not be granted on the basis that plaintiffs have property rights in slip 14.

Instead, the association's primary developed contentions before the trial court were that (1) plaintiffs had purchased a *relative position* in the moorage and not a *specific location* in the moorage and (2) the license agreement was contingent on the bylaws, and those bylaws, as amended, authorized the association to relocate plaintiffs' slip so long as plaintiffs remained in their *relative position*.[11]

In sum, the association now attempts to advance qualitatively different contentions than those raised for the trial court's consideration. Given those circumstances, review of the association's present, belated contentions would not comport with the fundamental prudential principles and practical considerations that underlie our preservation requirements. *See Wyatt*, 331 Or at 343 n 6 (describing rationales for preservation requirements); *J. Arlie Bryant, Inc. v. Columbia River Gorge Comm.*, 132 Or App 565, 568, 889 P2d 383, *rev den*, 321 Or 47 (1995) (same).[12]

B. *The Merits: The Effect of Bylaw Amendments on Plaintiffs' Asserted Entitlement to Continued Occupancy of the Location Designated as "Slip 14" as of the Time that the Parties Executed the License Agreement*

■ The association contends in its second assignment of error that the trial court erred in determining that the association "did not have the right or power to revoke or modify

---

[11] In its trial memorandum, the association stated that "[f]loating homes are tangible personal property, not real property. Laws and principles governing real property do not apply." (Footnote omitted; emphasis added.) We do not understand that argument to contend that the floating home *slip* is not real property or that a *license* does not convey property rights to a licensee. Even if we were to assume, *arguendo*, that it did contend as much, that two-sentence argument, never again raised at trial, was so undeveloped as to fail to alert the trial court as to the substance of the argument now being advanced on appeal. *See Wyatt*, 331 Or at 343.

[12] The association does not contend that the matter it raises for the first time on appeal is cognizable as an "error of law apparent on the face of the record." ORAP 5.45(1).

Plaintiffs' license and/or amend its bylaws to reconfigure the slips and compel Plaintiffs to move their houseboat to the adjacent slip." As we understand it, the association asserts that the trial court's reliance on that allegedly erroneous premise compels reversal of both (1) the trial court's grant of declaratory and injunctive relief to plaintiffs and (2) the dismissal of its counterclaim seeking a declaration that its amendments to the bylaws were valid and that plaintiffs were required to comply with the terms of those amendments.

■　　The association contends that the "license [agreement] * * * expressly states that it is subject to the terms of [the association's] bylaws" and notes that "the bylaws state that the bylaws may be revised or amended." The association further notes that "one of the terms of [the] bylaws is the number and configuration of slips available for use by the association's members."[13] From those bases, the association asserts that plaintiffs' entitlement under the license agreement to exclusive occupancy of slip 14 was necessarily subject to properly adopted amendments to the bylaws, including amendments reconfiguring or renumbering slips.

The association's contention in that regard is summary and unadorned. Nevertheless, as we understand it,

---

[13] The association also raises on appeal two other contentions challenging the trial court's determination. First, the association contends that the trial court erred because it based its conclusion that the association did not have the power or right to revoke or modify plaintiff's license or amend its bylaws "solely on the premise that Plaintiffs had acquired a property interest or property rights." As previously noted, 228 Or App at 634-36, the association failed to preserve that contention.

Second, the association contends that the right to terminate plaintiffs' license agreement is justified under the doctrine of mutual mistake. *See Restatement (Second) of Contracts* § 152(1) (1981) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he [or she] bears the risk of the mistake * * *."). The association argues that it was a basic—but mistaken—assumption of both the association and plaintiffs that, when they entered into the license agreement, the moorage had 24 slips suitable for mooring. The association's assertion is factually dubious in that the record discloses that the association had knowledge of the east-end trespass of the submerged land lease as early as 1990, 10 years before plaintiffs entered into the license agreement with the association. In all events, that contention was never raised before the trial court—and, thus, is unpreserved for our review. *Wyatt*, 331 Or at 343.

that contention may implicate either, or both, of two subsidiary propositions. First, specific language in the license agreement rendered plaintiffs' occupancy of the location designated as slip 14 conditional and subject to abrogation by way of subsequent bylaw amendments renumbering the slip locations. Second, regardless of whether specific language so provided, the terms of the license agreement are generally subject to modification through amendments of the bylaws.

The first of those propositions turns on the proper interpretation of the following provision of the license agreement:

> "Association hereby grants to Member a license to exclusively occupy slip number *in accordance with the terms and conditions of * * * the Bylaws.*"

(Emphasis added.)

The plain meaning of that provision is that the licensee is entitled to exclusively occupy the designated slip, so long as the licensee's occupancy comports with terms and conditions imposed under the bylaws. *See Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317-18, 129 P3d 773, *rev den*, 341 Or 366 (2006) (describing principles of contract interpretation). For example, the bylaws require that the member pay assessments, abide by architectural guidelines, and follow pet, garbage, and noise restrictions. Thus, the licensee/association member's continued exclusive occupancy of the designated location is conditioned upon complying with those requirements. Contrary to the association's view, that provision cannot reasonably be construed to provide that the licensee's entitlement to exclusive occupancy of the designated slip, as opposed to any other, is subject to abrogation through an amendment to the bylaws.

Nor is the second, and broader, proposition availing in these circumstances. To accord bylaw amendments the unqualified, absolutely preclusive effect that the association urges would permit the association, by way of bylaw amendments, to abrogate the fundamental bargain embodied in its license agreement with plaintiffs—or any other licensee.

Here, as the trial court found, and we concur, the location of the slip is a material term of the license agreement. *See Dalton v. Robert Jahn Corp.*, 209 Or App 120, 139, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007) (a term is material to the license agreement "when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement"). The association's members do not bargain for a general membership certificate that specifies no particular slip number; rather, the membership certificates provided by the association are *numbered* membership certificates, corresponding with the floating home slip numbers. Thus, from the outset, members expect that what they are purchasing is a *particular* slip number—and corresponding slip location—when they purchase their membership certificate. The number identifies the slip's location and serves as a point of distinction—it distinguishes the slip's location from other slip locations. Thus, a member bargains not for the right to *a* slip, but a *particular* slip—which is designated on the member's membership certificate and ultimately on his or her license agreement.

Were we to agree with the association's basic premise, the association could unilaterally amend the parties' most fundamental expectations under the license agreement. The association could, for example, enact an amendment to the bylaws that reconfigures the slips by splitting them in half and doubling their occupancy, thereby fundamentally altering the term "exclusively occupy" and compromising the suitability of the slips for mooring floating homes. Just as the association could not unilaterally amend the bylaws to effectuate such an end, it cannot unilaterally amend the bylaws to change the location of slip 14, a material term of the license agreement.

Accordingly, we conclude that the trial court correctly granted declaratory and injunctive relief to plaintiffs and dismissed the association's counterclaim seeking a declaration that its amendments to the bylaws were valid and that plaintiffs were required to comply with the terms of those amendments.

## C. *Attorney Fees*

Finally, we address the association's three assignments of error pertaining to the trial court's award of attorney fees to plaintiffs and its denial of the association's fee request. As noted, the trial court awarded plaintiffs attorney fees on their quiet title and declaratory judgment claims, as well as the association's counterclaim. The court reduced plaintiffs' request for attorney fees by 10 percent "to represent a reasonable allocation between time spent on fee[-generating] claims and on other matters" and by an additional 5 percent "to account for problems in block billing," for an ultimate recovery of $85,000. The court denied the association's request for attorney fees on the breach of fiduciary duty, oppression, and RTLA claims.

■       In its fourth assignment of error, the association contends that the trial court erred in awarding plaintiffs attorney fees for work rendered jointly on behalf of plaintiffs, as well as other plaintiffs with whom the association had settled. Plaintiffs respond that, although attorney fees were not recoverable for work performed solely on behalf of the other plaintiffs with whom the association had settled, fees were recoverable for work done on issues common to all of plaintiffs' claims. We agree.

■       "When a party prevails in an action that encompasses both a claim for which attorney fees are authorized and a claim for which they are not, the trial court must apportion attorney fees, except when there are issues common to both claims." *Bennett v. Baugh*, 164 Or App 243, 247, 990 P2d 917 (1999), *rev den*, 330 Or 252 (2000). The record establishes that plaintiffs' counsel excised from his request for attorney fees any time spent on work done solely for the other plaintiffs with whom the association had settled and, consequently, counsel sought fees only for time spent on issues common to all plaintiffs. Furthermore, in an abundance of caution, the trial court reduced the number of hours by an additional 10 percent "to represent a reasonable allocation between time spent on fee[-generating] claims and on other matters." The trial court was well within its discretion to apportion the fees accordingly. *See Parrott v. Carr Chevrolet,*

*Inc.*, 156 Or App 257, 282, 965 P2d 440 (1998), *rev'd in part on other grounds*, 331 Or 537, 17 P3d 473 (2001) ("The amount of attorney fees [to be awarded is an issue] as to which the trial court has wide discretion.").

■        In its fifth assignment of error, the association contends that the trial court erred in awarding plaintiffs attorney fees for work reflected in block billing entries that did not indicate which work related to the claims on which plaintiffs prevailed and which work related solely to claims on which the association prevailed. The trial court determined that "the block billing approach by the plaintiffs' lawyers makes it difficult but not impossible to determine a fair estimate of time spent on the fee claims"—and, accordingly, applied a five percent reduction in hours "to account for the problems in block billing," in addition to the 10 percent reduction noted above. Again, we cannot say that, in the totality of the circumstances, the trial court erred in its methodology or abused its discretion in its determination of the amount of fees awarded. *Id.*; *see also Freedland v. Trebes*, 162 Or App 374, 379, 986 P2d 630 (1999) ("[I]n a contract action involving a number of claims and counterclaims in which the prevailing party receives a net award on the basis of a single claim, the court could conclude that all of the time devoted to the case was necessary to achieve the success that the party achieved in the action.").

■        In its sixth and final assignment of error, the association contends that the trial court erred in denying the association's request for attorney fees on the claims on which the association prevailed. The attorney fee provision of the license agreement reads as follows:

> "If suit or action is instituted to enforce the provisions of this agreement, the losing party shall pay the prevailing party all such actual costs in connection with such suit or action, including such sums as the court or courts may judge reasonable as attorney's fees at trial and on appeal."

The association contends that the license agreement provides that the prevailing party is entitled to attorney fees so long as the *action* is instituted to enforce the provision of the license agreement. The association further argues that

"the prevailing party" under the license agreement is determined under ORS 20.077[14] on a claim-by-claim basis.

Plaintiffs respond that, although the association may be the prevailing party on three of the claims, it is not entitled to attorney fees under the license agreement because the claims on which it prevailed were not "instituted to enforce the provisions of [the] agreement." Thus, according to plaintiffs, the license agreement does not authorize attorney fees on those claims. We agree with plaintiffs.

Entitlement to attorney fees is a question of law. *Selective Services, Inc. v. AAA Liquidating*, 126 Or App 74, 77, 867 P2d 545 (1994). As a general rule, a party has no right to recover attorney fees from an opponent unless a statute or contract confers that right. *Mattiza v. Foster*, 311 Or 1, 4, 803 P2d 723 (1990). In the absence of a contrary intention, it is presumed that the parties intended the reference to "prevailing party" in a contractual attorney fee provision to have the meaning set out in ORS 20.077(2), that is, "the party who receives a favorable judgment or arbitration award on *the claim.*" (Emphasis added.) *See Northwest Country Place v. NCS Healthcare of Oregon*, 201 Or App 448, 462, 119 P3d 272

---

[14] ORS 20.077 provides, in part:

"(1) In any action or suit in which one or more claims are asserted for which an award of attorney fees is either authorized or required, the prevailing party on each claim shall be determined as provided in this section. The provisions of this section apply to all proceedings in the action or suit, including arbitration, trial and appeal.

"(2) For the purposes of making an award of attorney fees on a claim, the prevailing party is the party who receives a favorable judgment or arbitration award on the claim. *If more than one claim is made in an action or suit for which an award of attorney fees is either authorized or required, the court or arbitrator shall*:

"(a) Identify each party that prevails on a claim for *which attorney fees could be awarded*;

"(b) Decide whether to award attorney fees on claims for which the court or arbitrator is authorized to award attorney fees, and the amount of the award;

"(c) Decide the amount of the award of attorney fees on claims for which the court or arbitrator is required to award attorney fees; and

"* * * * *

"(4) *This section does not create a claim to an award of attorney fees in any action or suit in which the court or arbitrator is not otherwise authorized or required to make an award of attorney fees by contract* or other law."

(Emphasis added.)

(2005) (ORS 20.077 governs the determination of "prevailing party" status for actions commenced after the effective date of the statute).

Thus, the issue here reduces to whether, where (1) plaintiffs instituted an "action * * * to enforce the provisions of [the license] agreement," which also included noncontractual claims, and (2) the association prevailed in some of the noncontractual claims but did not prevail on the claims to enforce the license agreement, the association is entitled, under the contract fee provision, to recover attorney fees incurred in successfully defending the noncontractual claims. The answer is "no." *See CMS Sheep Co., Inc. v. Russell*, 179 Or App 172, 39 P3d 262, *rev den*, 334 Or 260 (2002).

In *CMS Sheep Co.*, the parties had entered into a lease that included an attorney fee provision that was very similar to that in this case:

> " 'In case suit or action is instituted to enforce any term of this lease, the losing party agrees to pay such sum as the trial court may adjudge reasonable as attorney fees and costs to the prevailing party.' "

*Id.* at 176. The plaintiffs subsequently brought claims for breach of contract (lease) and timber trespass and various equitable claims. The plaintiffs succeeded only on their timber trespass claim, and, as pertinent here, the defendants sought to recover attorney fees incurred in their successful defense of the breach of contract claims. *Id.* The trial court denied the defendants' fee request. *Id.* at 177.

We reversed that denial. In so holding, we concluded that, because the defendants had prevailed on the breach of contract claims asserted against them, they were the prevailing parties "on all *claims to which the attorney fee provision in the* [*contract*] *applies*" and were entitled to attorney fees on those claims. *Id.* at 178 (emphasis added). That is, notwithstanding the ostensible breadth of the attorney fee provision's introductory clause ("[i]n case * * * *action* is instituted to enforce any term of this lease * * *" (emphasis added)) and the similarly broad reference to "the losing party," we held that the lease's fee provision conferred a fee entitlement only with respect to claims brought to enforce the lease.

Here, as in *CMS Sheep Co.*, the only "claims to which the attorney fee provision in the [contract] applies," *id.*, were plaintiffs' claims for declaratory judgment and the association's counterclaim. Plaintiffs prevailed on each of those claims. Accordingly, although the association successfully defended various claims that did not seek enforcement of the license agreement, the trial court correctly concluded that the association was not entitled, under the license agreement, to recover attorney fees incurred in defending those claims.[15]

Affirmed.

---

[15] Although the operative facts in *CMS Sheep Co.* arose at a time when the operative "prevailing party" statute was *former* ORS 20.096(5) (1999), *repealed by* Or Laws 2001, ch 542, § 3, the predecessor to ORS 20.077, we see no reason why *CMS Sheep Co.*'s identification of the claims giving rise to a fee entitlement under a very similarly worded contractual fee provision should not be conclusive here.